212 So.2d 369 (1968)
GENERAL CAPITAL CORPORATION, a Florida Corporation, Appellant,
v.
TEL SERVICE CO., Inc., a Florida Corporation, Appellee.
GENERAL CAPITAL CORPORATION, a Florida Corporation, Appellant,
v.
TEL SERVICE CO., Inc., a Florida Corporation, G.E. Grass and Richard A. Noll, Appellees.
Nos. 4990, 7477, 67-106.
District Court of Appeal of Florida. Second District.
June 12, 1968.
Rehearing Denied August 6, 1968.
*371 William Reece Smith, Jr., of Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, for appellant.
William B. Holland, Winter Haven, E.A. Bosarge, Bartow, and Henry M. Sinclair and Norman A. Sand of Sinclair, Barfield & Louis, Miami, for appellees.
PIERCE, Acting Chief Judge.
General Capital Corporation, a Florida corporation, appellant, but referred to herein as GC, brings to this Court three appeals, all growing out of the same Circuit Court action. No. 4990 is an appeal from a Final Decree rendered in favor of appellee, Tel Service Co., Inc., a Florida corporation, plaintiff below, referred to herein as TS, in a suit brought against GC in the Polk County Circuit Court. No. 7477 is an appeal from an Amended Final Decree entered after a temporary remand by this Court in the light of intervening legislation. No. 67-106 is an appeal from a Final Judgment awarding money damages pursuant to an accounting ordered in the final decree. In the last two appeals G.E. Grass and Richard A. Noll were added by the lower Court as new plaintiffs. The two *372 decrees and one judgment were all in favor of plaintiff(s) involved and against GC.
This overall case has been in Court for over six years. The record here is voluminous, comprising twenty-two volumes of testimony and proceedings. There are over two thousand pages of original typewritten matter, also ninety-six separate exhibits, most of which are multi-pages, some being over a hundred pages each. In addition to such record, there have been filed here lengthy briefs and manifold motions, suggestions, objections, etc., of the parties. The complexities of the case prompted us to allot a full day for oral argument. Hinging upon the outcome is upwards of a million dollars or more in cash.
But in spite of the ramifications of the case and the obvious importance of the outcome, the issues now before this Court are clearly defined. They are (1) whether the evidence before the Chancellor was sufficient to sustain his original Final Decree; (2) whether Ch. 65-299, enacted by the 1965 legislature, was applicable to this case; (3) the propriety of the Chancellor allowing two individual persons to be added as parties plaintiff while appeal from the Final Decree was pending here; and (4) the computations followed by the Chancellor in arriving at the amount of the final judgment.
On and prior to August 13, 1959, GC was in the commercial finance and discount business. TS was in the business of manufacturing covers for telephone directories and selling advertising space thereon either for cash or upon a deferred time basis evidenced by the usual commercial paper executed by the purchaser.
On the date aforesaid, the parties entered into a written contract which provided substantially: that GC would "buy" such commercial paper for the face amount thereof, less a "discount" of 11%; that a "reserve" of 25% would also be deducted, to be repaid when the particular paper was "paid in full"; that TS would repurchase any defaulted paper, paying GC the full amount due thereon, plus any expense of collection; that GC would "have recourse to the said reserved fund" if TS defaulted in the contract; and that TS would not "accept collection" of the paper after sale to GC.
Thereafter, from time to time, the agreement was mutually changed in writing so as to finally fix the "discount" to be 17 1/2% and the "reserve" to be 20%. Simultaneously with execution of the contract there was signed a "guaranty" by the three sole stockholders of TS and also two real estate mortgages by the President of TS; all as "security" to GC for the "performance" of TS under the contract.
From the date of the contract the parties did a heavy volume of business, but around the first of April, 1962, they had irreconcilable differences, resulting in the filing in the Polk County Circuit Court on April 10, 1962, by TS of a complaint against GC, in which it was alleged in substance: that notwithstanding the terms of the contract, the relationship of the parties had actually been that of lender and borrower; that the contract of August 13, 1959 was "a scheme and device" contrived to cover up the real nature of the enterprise, which was that of lending money; that during the time they were doing business, GC had "loaned" to TS approximately $570,000 and there had been deducted therefrom more than $125,000, which latter amount was more than 25% per annum[1] upon the main consideration; that therefore, under F.S. § 687.07 F.S.A.,[2] the whole commercial *373 venture was infected with criminal usury and GC had thereby forfeited to TS, not only the face value of the paper, but the amounts deducted as well.
The complaint thereupon prayed that the moneys paid by GC to TS be decreed to be a usurious loan in violation of said § 687.07, that the Court order an "accounting of the transactions between the parties" to determine the amount of money owed by GC to TS "for principal and interest", that a money decree be entered therefor in favor of TS "as a forfeiture of the same" pursuant to the statute, and that GC be required to transfer back to TS all current commercial paper then held and the written guaranties of the stockholders aforesaid and also to cancel the mortgages.
GC filed answer on April 18, 1962, denying that the transactions constituted loans or that the relationship between them was that of borrower and lender, and asserting that all their commercial dealings had been sales of commercial paper with discounts, etc., as provided in the contact, except one transaction on May 12, 1961, whereby TS did borrow from GC $12,500 secured by a recorded chattel mortgage, upon which there was a current balance of $8,508.29, but which matter was separate from the commercial dealings under the contract. The answer further denied that the contract of August 13, 1959 was any "alleged scheme" to circumvent the usury laws but that all transactions thereunder were what the contract stated.
By counterclaim GC alleged that TS had made collections upon numerous previously assigned items without accounting therefor to GC, and that TS should be enjoined from making such further collections; and that the chattel mortgage of May 12, 1961 was in default and should be foreclosed. Relief was prayed accordingly.
On November 5, 1962, GC submitted four additional affirmative defenses: (1) unclean hands, (2) estoppel, (3) laches, and (4) statute of limitations.
After taking much testimony the trial Judge entered Final Decree, finding in substance: that the contract of August 13, 1959 and the subsequent dealings pursuant thereto constituted a continuous loan of money from GC to TS rather than the purchase of commercial paper; that the monies realized by GC upon the paper exceeded what it paid TS therefor by more than 25% and therefore constituted "criminally usurious interest"; and that none of the affirmative defenses of GC were supported "by the necessary preponderance".
The decree in its decretal portion (1) declared the entire transaction to be void and ordered the same cancelled; (2) adjudged that TS should recover from GC all monies received plus the "interest charged thereon"; (3) cancelled all assignments of commercial paper theretofore delivered to GC and ordered return to TS of all unpaid notes and paper; (4) ordered all "reserve" funds held by CC paid to TS; (5) directed accounting to be had before a Special Master to determine the amount of TS's "recovery", GC to be given offsets on the chattel mortgage and the monies collected by TS on paper previously assigned; and (5) cancelled the real estate mortgages given by TS's stockholders. On March 25, 1964, GC appealed the Final Decree to this Court, as case No. 4990.
After briefs had been filed on the appeal, the 1965 legislature enacted Ch. 65-299, effective June 23, 1965. GC filed *374 motion here asking that said Ch. 65-299 be applied to this case, and TS countered with suggestion that the 1965 Act was unconstitutional. On February 16, 1966, this Court entered an order which after briefly stating the foregoing history of the litigation, temporarily relinquished jurisdiction back to the trial Court "in view of the 1965 Act."
Upon such temporary remand, the trial Court, on June 27, 1966, without taking evidence and over objection of GC, "found" that the transactions between the two corporations were "in fact" loans of money from GC to G.E. Grass and Richard A. Noll (principal stockholders of TS) as individuals rather than to the corporation, "ordered * * * on its own motion" Grass and Noll added as parties plaintiff to the suit, and held that their joinder made the 1965 Act "inapplicable".
At this stage of the case numerous pleadings were filed, hearings had, and orders entered, which will be reviewed later. Suffice here to state that on August 26, 1966 the Chancellor entered an Amended Final Decree and a separate order, the intent of which was to carry forward the decretal portions of the Final Decree but to substitute Grass and Noll as beneficiary plaintiffs instead of TS. On December 9, 1966, GC appealed the Amended Final Decree to this Court as case No. 7477.
While the foregoing two appeals were pending, proceedings continued in the Circuit Court on the "accounting" ordered in the Final Decree. A Special Master was appointed, who ultimately made findings which the Court approved, resulting in entry of a Final Judgment for $710,911.08 against GC and in favor of TS and the individuals Grass and Noll.
From such Final Judgment, GC on March 13, 1967 filed appeal to this Court. This appeal, numbered here as case No. 67-106, constituted the third appeal lodged here, arising out of the same Circuit Court case. The three cases were exhaustively briefed and have been consolidated for argument and disposition. We will treat each appealed case separately.

Case No. 4990
It is true, as counsel for GC point out, that ready flowing financing is the life blood of modern enterprise, that freedom of contract is the fundamental cornerstone of business dealings and endeavor, and that the commercial life of our modern society rests upon these two postulates remaining inviolate. But such maxims, in our government of laws and not of men, must always yield to the rigidity of established legal principles.
F.S. § 687.07, F.S.A., hereinbefore quoted, by its terms applies to a lending of money "by any contract, * * * or device whatever, directly or indirectly, by way of * * * discount, * * * pretended sale of any article, * * * or otherwise". (Emphasis supplied).
The Chancellor in his Final Decree correctly stated that "the basic question in this case is whether or not the transactions between the parties were sales or loans". After personally hearing all the testimony and considering all the exhibits, he found that they were loans and not sales. We have laboriously explored the record, and while we might have decided differently if we had been the trier of the facts, the record here clearly impels our conclusion that there was ample competent and substantial evidence to sustain the Chancellor's findings. We therefore affirm.
The usurious nature of a contract is to be determined as of the date of its inception. First Mortgage Corporation of Vero Beach v. Stellmon, Fla.App. 1964, 170 So.2d 302. In such determination the parties are permitted to testify as to their purposes and intentions, and the question of intent is always to be gathered from circumstances surrounding the entire transaction, bearing in mind always that the difference between a lawful transaction and one that is usurious is the difference *375 between "good faith" and "bad faith". River Hills, Inc. v. Edwards, Fla.App. 1966, 190 So.2d 415. Consonant with the foregoing ground rules, the Chancellor, in summing up his findings in the Final Decree, said:
"Disregarding the form of the transaction as set forth in the agreement between the parties, and taking into consideration its details, and the testimony of the parties, the Court finds that it was the real intent of the parties that the transaction should be a loan, and that the evidence of this intent is clear and convincing."
The Chancellor reviewed the testimony of numerous witnesses appearing before him, particularly Mr. Grass, President of TS, and Messrs. Gruber & Spector, President and Executive Vice President of GC. Grass testified that he first contacted Gruber in July, 1959, to "borrow money" for expansion of TS's business, which proposal was "interesting" to Gruber. Extended negotiations ensued, during which Grass was instructed by Spector to form a corporation because corporations could be "charged higher interest". Such corporation was formed. When the "sales" language of the contract came to light Grass inquired why such language was used and Spector explained that they "had to make it look like a sale" because of accounting procedures, even though it was in fact a loan. Gruber and Spector denied the incriminating features of such testimony, and the Chancellor conceded in his findings that "the testimony of the witnesses as to the intent of the parties, i.e. whether they intended the transaction to be a loan or a sale is in hopeless conflict". But he resolved such conflict in favor of TS, finding that "the Court * * * accepts Mr. Grass's version of the nature of the transaction".
The contract of August 13, 1959, required that all assigned commercial paper would be "unqualifiedly endorsed with full recourse" to GC, required TS to "repurchase any note or trade acceptance after default by the maker thereof", and provided for the "deduction of a reserve", to which GC would have recourse in the event TS "failed to perform a condition of the contract".
In addition to the personal written guaranties of the stockholder-officers of TS for performance of the agreement, Mr. Grass and his wife were required to further secure such performance by executing and delivering to GC mortgages on valuable real property personally owned by them. Referring to such provisions of the contract and the conditions attendant to its execution, the Chancellor found that
"[i]n the light of these facts, the conclusion is inescapable that [GC] intended to insure the return of all money advanced to [TS] at all events, and that the return of the advance was secured rather than being put in hazard, except, of course, those hazards that are incident to any loan of money".
The modern trend of the reported Florida cases is to take a dim view of transactions where lenders advance money to necessitous debtors and receive back ostensible sales assignments or other legal documents, the net result of which is to return to the lenders profits therefor in excess of 25% per annum, at the same time exacting multiple guaranties, collateral securities, etc., obviously to insure repayment of the initial investment. The Courts seemingly categorize such transactions as loans of money drawing usurious interest, regardless of the linguistic cloak with which they are enshrouded.
Thus in Dante v. Givens, Fla.App. 1963, 156 So.2d 13, a mortgagee had assigned a $6,800 mortgage for the sum of $3,000, together with the assignee's written promise to re-assign the same back if the mortgagee within six weeks returned to the assignee the $3,000, plus $600 in addition. The Circuit Court held the transaction to be a usurious loan rather than a sale of the mortgage. The 3rd District Court affirmed.
*376 In Gordon v. West Florida Enterprises of Pensacola, Inc., Fla.App. 1965, 177 So.2d 859, a note and mortgage in the amount of $3,919.80 was payable back in sixty monthly installments of $65.33 each, but the amount advanced was only $2,450.00. The loan was in connection with a building repair and remodelling contract and the lender contended the interest was permissible under the Retail Installment Sales Act, F.S. Ch. 520 F.S.A. The Circuit Court held that, because the interest contracted for was between 15% and 25%, such interest was forfeited, but apparently was sympathetic to the applicability of Ch. 520, and decreed foreclosure of the mortgage for the unpaid principal of the loan, plus costs and attorney's fee. The 1st District Court reversed, however, holding that the borrower was entitled to a forfeiture of double the amount of interest reserved, which effected complete cancellation of the note and mortgage. Two passing observations in the Gordon case are of significance here. One was the reference, quoting Judge Allen of this Court in Brown v. Home Credit Co., Fla. App. 1962, 137 So.2d 887, to the lender as "being practiced in the lending profession", which would be apposite to GC, which has done an extensive business in buying commercial paper and lending money on accounts receivable since 1951. The other is the reference, quoting Justice Drew in Home Credit Co. v. Brown, Fla. 1962, 148 So.2d 257, to "the principle that the vice of usury is one which inheres in the parties' agreement itself", which is what the Chancellor held here.
In Ross v. Whitman, Fla.App. 1966, 181 So.2d 701, the lender sued upon two notes, one for $6,000 which contained thereon merely the words "with interest", and the other for $5,000 which left the percentage of interest blank. Certain semi-annual interest payments amounting to 15% of the principal were made thereafter, but because there was no written provision for payment of interest at a rate in excess of 10% per annum, the Circuit Court held the notes to be not usurious. The 3rd District Court reversed, holding that the lender was "not absolve[d] * * * where the amount or rate of interest * * * received was usurious".
Griffin v. Kelly, Fla. 1957, 92 So.2d 515, was a case where a borrower made a note to repay $89,000 in two years at 6% interest, but upon the further condition that the lender would have an option to purchase $59,300 worth of stock for $59.30. Upon default in payment of the note, the lender sued thereon and the borrower interposed the defense of usury. The Circuit Court entered judgment for the lender, but the Supreme Court reversed. In the course of the opinion, the late Justice Hobson, quoting with approval from Restatement of Contracts, Sec. 529, said:
"Where the intent of a party to a bargain is to make a loan of money * * * for a greater profit than is allowed by law, the agreement is illegal though the transaction is put in whole or in part in the form of a sale, a contract to sell or other contract." (Emphasis supplied).
In Kay v. Amendola, Fla.App. 1961, 129 So.2d 170, the Circuit Court had held that a real estate option contract was a cloak to cover up a usurious loan of money. This 2nd District Court upheld such finding, and in the course of the opinion observed that the lender contended
"* * * that the transaction involved here was not a loan and repayment but was simply a sale and purchase transaction. We do not agree. It is well settled in Florida that the law will look to the substance of the transaction rather than to the form to determine usury.
"Our usury statutes show a clear legislative intent to prevent accomplishment of a usurious scheme by indirection, and the concealment of the needle of usury in a haystack of subterfuge will not avail to prevent its pricking the body of the law into action."
*377 In Applebaum v. Laham, Fla.App. 1964, 161 So.2d 690, there was a loan of $15,000 drawing 10% interest, but a $3,000 commission was taken out of the proceeds of the loan by the lender's agent. The lender was not "a professional or a frequent money lender", and had no actual knowledge of the exaction of the $3,000 by the agent. The Circuit Court held that under such circumstances the lender could not have knowingly or wilfully charged or accepted more than the legal rate of interest. The 3rd District Court reversed, holding that the exaction of the bonus or commission by the agent made the loan usurious, in the absence of evidence that the agent was acting "within the scope of his authority in making the usurious charge".
In the case of Atlas Subsidiaries of Florida, Inc. v. O. & O., Inc., Fla.App. 1964, 166 So.2d 458, the borrowers were required by the lender finance company, to form a corporation for purpose of the transaction and also to guarantee in writing the payment of the mortgage note as a condition for making the loan, the same as here. The 1st District Court affirmed a Circuit Court decree holding the loan to be criminally usurious, and in the course of the opinion quoted with approval the trial Court's observation that the
"`* * * corporation was formed and incorporated under the laws of Florida, at the insistence of the defendant and as a prerequisite to their making of the loan as a sham contrivance or device, for the purpose of evading the provisions of Chapter 687 of the Florida Statutes by charging and collecting a rate of interest greater than ten per cent. per annum. The rate of interest charged or accepted by the defendants on the sum of money loaned is greater than twenty-five per cent. per annum. The defendants wilfully intended to violate the provisions of Chapter 687, Florida Statutes, and are subject therefore to the penalties prescribed by Section 687.07 thereof.'
* * * * * *
That sham contrivance and device has so frequently been used in this state as to be an old acquaintance of those dealing in the lending arts. The pattern followed in this case is typical of a long-existing practice on the part of scheming money-lenders who set out to flaunt the usury laws of the state on a magnificent scale."
In First Mortgage Corporation of Vero Beach v. Stellmon, Fla.App. 1964, 170 So.2d 302, a note secured by a mortgage was payable back in 120 equal monthly installments which, if it had run to maturity, would have carried slightly less than 10% interest per annum. The note contained an acceleration clause but without any provision, in the event of default, for elimination of unearned interest on the installments precipitated to maturity. After default in some of the monthly payments, action to foreclose the mortgage was filed as to the defaulted past due installments. The Circuit Court held the note to be "civilly usurious" notwithstanding the lender's election not to accelerate the entire amount due but to seek foreclosure only upon the past due unpaid installments. This 2nd District Court affirmed, but held the note actually to be "criminally usurious" because of the "election" it gave the lender.
The late federal case of American Acceptance Corporation v. Schoenthaler (C.C.A.5 Fla.) 391 F.2d 64, decided January 29, 1968, opinion written by Circuit Judge Bryan Simpson, was a case involving the Florida usury laws. On May 26, 1964, Schoenthaler executed and delivered to one Maxwell two promissory notes, one for $238,434.14 without interest prior to maturity, and the other for $170,000.00 bearing 10% interest per annum. Both notes were to be paid off by single monthly payments of $7,612.50 for 60 successive months, each monthly payment to be applied first to the accrued interest on the smaller note and then toward payment of principal on the larger note. No payments were made on either note, so in due course AAC, assignee of the notes from Maxwell, filed suit on *378 both notes. Schoenthaler defended on the ground it was a usurious transaction. AAC asserted that the two notes applied to separate parts of the transaction: the larger note pertaining to the sale of personal property consisting of furnishing, fixtures, etc., for a motel in Naples, Florida, being built by Schoenthaler; and the smaller note representing a loan of money at a permissible non-usurious rate of interest. Contrary to AAC's contention, the Court found that the evidence "as a whole leads to the inescapable conclusion that the two notes represent but one loan transaction" and reasoned
"* * * Florida law requires examination of the substance of the transaction rather than the mere form to determine usury. Kay v. Amendola, 129 So.2d 170, (2d D.C.A.Fla. 1961) * * *
Time and again the Florida courts have looked to the substance of a transaction to determine if it was a loan rather than a purported sale. Griffin v. Kelly, 92 So.2d 515 (Fla. 1957); Brown v. Home Credit Co., 137 So.2d 887 (2nd D.C.A. 1962), aff'd 148 So.2d 257 (Fla. 1963); Gordon v. West Florida Enterprises of Pensacola, Inc., 177 So.2d 859 (1st D.C.A. 1965). The same approach has been taken by this Court in Conner Air Lines, Inc. v. Aviation Credit Corporation, 5 Cir.1960, 280 F.2d 895, cert. den. 364 U.S. 911, 81 S.Ct. 274, 5 L.Ed.2d 225.
* * * * * *
After its critical analysis of Amendola, AAC implies that there is no other Florida authority allowing a court to pierce the form of a transaction to examine its substance. The preceding authorities amply dispose of such an implication.
* * * * * *
AAC, as assignee of the notes from Maxwell, now seeks to separate the two transactions in order to save them from the vice of usury. AAC begins its argument with numerous citations indicating that the usury laws do not apply to the sale of personal property. The District Judge recognized, and it has never been argued otherwise than that the usury laws do not apply to such a sale. Mid-State Homes, Inc. v. Staines, 161 So.2d 569 (2d D.C.A.Fla. 1964); Davidson, et al. v. Davis, 59 Fla. 476, 52 So. 139, 28 L.R.A.,N.S., 102 (1910). The critical issue is not whether the usury laws apply to the sale of personal property, but whether the instant case actually was a sale rather than a loan. Davidson v. Davis, supra, makes it clear that the intent of the parties is determinative as to whether a transaction is a loan rather than a sale. The intent of AAC and Maxwell is revealed at numerous points in the record * * *".
In the case of Indian Lake Estates, Inc. v. Special Investments, Inc., Fla.App. 1963, 154 So.2d 883, strongly relied upon by GC, the Circuit Court held that the transactions there involved were sales and not usurious loans. Upon appeal this 2nd District Court affirmed, applying the same principle applicable here, namely, that the intent of the parties control the factual determination of whether there has been a sale or loan, and that the lower Court had sufficient evidence before it to support its finding.
For other cases of similar vein, see Brown v. Wood, Fla.App. 1967, 202 So.2d 125; Farr v. Clement, Fla.App. 1967, 202 So.2d 613; Haines v. Leonard L. Farber Company, Fla.App. 1967, 199 So.2d 311; Tiernan v. Sheldon, Fla.App. 1966, 191 So.2d 87; Sheldon v. Tiernan, Fla. 1967, 200 So.2d 183; Argenbright v. J.M. Fields Co., Fla.App. 1967, 196 So.2d 190; and Walker v. Narose Bldgs., Inc., Fla.App. 1968, 206 So.2d 400.
We can conclude this part of the opinion by restating the language of Judge Allen of this Court in Cutri Enterprises, Inc. v. Pan American Bank of Miami, Fla.App. *379 1959, 115 So.2d 592, a usury case, as follows:
"We have studied this voluminous record and the briefs of counsel and conclude that the lower court had sufficient facts upon which he could and did make the findings of fact hereinabove summarized. The determination of questions of fact is a function of a trial court and an appellate court does not seek to reevaluate the facts in opposition to the determination of the lower court. A trial judge has the same power that a jury has on disputed questions of fact. See Hill v. Beacham, 79 Fla. 430, 85 So. 147; Joyner v. Bernard, 148 Fla. 649, 6 So.2d 533; Goldfarb v. Robertson, Fla. 1955, 82 So.2d 504."
On the matter of the affirmative defenses pleaded by GC, they can be disposed of in short order. As for unclean hands and estoppel, it has been repeatedly held in Florida that the statutory penalties against usury may be invoked by a borrower though he be a participant or even the instigator in the usurious transaction. Whether this is good law, and the writer has some doubts, it is firmly established in Florida. Enstrom v. Dunning, 1939, 136 Fla. 253, 186 So. 806; Chakford v. Sturm, Fla. 1953, 65 So.2d 864; Mears v. Mayblum, Fla. 157, 96 So.2d 223; Gilbert v. Doris R. Corp., Fla.App. 1959, 111 So.2d 682; Lee Construction Corp. v. Newman, Fla. App. 1962, 143 So.2d 222; Griffin v. Kelly, supra; and Robbins v. Blanc, 1932, 105 Fla. 625, 142 So. 223.
The defense of laches is only available where the lapse of time has not alone been unreasonable, but it has also operated to the disadvantage or prejudice of the other party. Reed v. Fain, Fla. 1961, 145 So.2d 858; State ex rel. Clendinen v. Dekle, Fla. 1965, 173 So.2d 452; Wagner v. Moseley, Fla.App. 1958, 104 So.2d 86. Neither factor is shown to exist here.
Statutes of limitations apply to law actions only. Reed v. Fain, supra. Also, such defense begins to run from the date the last installment becomes due and payable. Young v. Wilder, Fla. 1955, 77 So.2d 604, 48 A.L.R.2d 397; Hagan v. Neeb, 1932, 105 Fla. 297, 140 So. 916; Wenck v. Insurance Agents Finance Corporation, Fla. App. 1958, 99 So.2d 883. The first piece of commercial paper transmitted to GC by TS under the contract of August 13, 1959, was due and payable on April 1, 1961, and therefore the instant action was filed well within the statute of limitations.
So in case No. 4990, the final decree appealed from is affirmed.

Case No. 7477
While case No. 4990 was pending here on appeal, but before argument, the 1965 legislature enacted Ch. 65-299, brought forward in the compilations as F.S. § 687.11, F.S.A., which inter alia is as follows:
"687.11 Interest rates; individuals secondarily liable.
(1) No individual secondarily liable as endorser, guarantor, surety, or otherwise on any corporate obligation shall be required, in any proceeding for collection of interest in the courts of this state, to pay any interest in excess of ten (10%) per cent per annum, and any interest claimed therein against such individual in excess of ten (10%) per cent per annum shall be forfeited; and no corporation, in any such proceeding in the courts of this state where the interest is proven to exceed fifteen (15%) per cent per annum, shall be required to pay any interest, and in such event all interest shall be forfeited.
(2) All laws or parts of laws in conflict herewith and all other statutory penalties for usury applicable to loans to corporations are hereby repealed."
After passage aforesaid, the parties filed in this Court reciprocal motions and suggestions based upon the 1965 Act, whereupon on February 16, 1966 we entered per *380 curiam order which, in its essential part, is as follows (Fla.App., 183 So.2d 1):
"It is apparent that Section 687.07, Florida Statutes 1963, F.S.A., was the basis of the proceedings below. However, subsequent to the entry of the final decree and the filing of the notice of appeal, Chapter 65-299, Laws of Florida 1965, was enacted, the provisions of which may have some effect on Section 687.07. The appellant has filed a motion here for application of the intervening legislation, and the appellee has filed a suggestion of the unconstitutionality of intervening legislation, plus a motion for an order suspending appellate proceedings, and remanding the cause to the trial court for consideration of its suggestion of unconstitutionality. Since we have a law of the State of Florida which intervenes subsequent to the law on which this case was originally decided, we temporarily relinquish jurisdiction over this cause and remand it to the lower court for reconsideration and redetermination of the issues that may arise in view of the 1965 Act. See Northeast Polk County Hospital District v. Snively, Fla. 1964, 162 So.2d 657; and ABC Liquors, Inc. v. State of Florida ex rel. Wolfe, Fla.App. 1965, 179 So.2d 256. In reconsidering this case the lower court may allow or decree such amendments or alterations as are appropriate.

Upon the lower court's disposition of the previously mentioned issues, for which purpose we are temporarily relinquishing jurisdiction, the attorneys for the parties are directed to advise this Court of such disposition by appropriate motion or petition for further consideration." (Emphasis supplied).
Thereafter, on April 29, 1966, TS filed in the lower Court a motion to amend its complaint "by adding G.E. Grass and Richard A. Noll as parties plaintiff" and to amend the Final Decree "to conform to the evidence" originally presented upon "the issues raised therein". The motion recited that Grass and Noll were "the real parties in interest" and that the suit was first brought in the name of TS "because the loan documents and assignments of paper were made in the name of the corporation", but that by the amendment "the relief to the individuals would be the same as that heretofore granted by the Court to plaintiff corporation".
GC filed objections to the motion to amend, but on June 27, 1966, the trial Judge entered an order which granted "in toto" the motion of TS to amend, added Grass and Noll as parties plaintiff by the Court's "own motion", and directed that "an Amended Final Decree shall be entered in due course by the Court".
On July 14, 1966, GC filed supplemental answer to the original complaint of TS and also an answer to the complaint as amended by the addition of Grass and Noll as parties plaintiff, the essence of which lengthy documents was to challenge upon ten separate grounds the procedural changes being sanctioned by the Court. On August 26, 1966, upon motion of plaintiffs, the Court struck outright six of such defenses and declared the remaining four "inapplicable", then went on to state that "there being no additional evidence which would be relevant to this cause an Amended Final Decree in conformance with the mandate of the District Court of Appeal * * is filed simultaneously herewith".
Accordingly on the same date, the Judge entered an Amended Final Decree, which carried forward generally the Final Decree of December 16, 1963, with the following additional provision: that the Court had added Grass and Noll as parties plaintiffs and they had signified "their acceptance of the status of plaintiffs"; that the plaintiffs had filed motion to strike the defenses of GC, which motion had been "disposed of" by the Court; that the "paper transactions" between GC and TS, while ostensibly in the form of sales to TS, were "actually in fact" loans made by GC "to the individual *381 plaintiffs, G.E. Grass and Richard A. Noll"; that Ch. 65-299 was inapplicable to plaintiffs Grass and Noll, "with whom the usurious contract was negotiated and for whose benefit the transactions were consummated"; and that because more than 25% per annum has been "charged", GC had "wilfully and corruptly intended to violate the provision of" the Florida usury laws.
The decretal portion of the Amended Final Decree adjudicated that Ch. 65-299 was "inapplicable to this cause", and directed the Circuit Clerk to advise this 2nd District Court that the lower Court had "reconsidered and redetermined the issues that may arise in view of Ch. 65-299" and had completed its "judicial labors" in accordance with the "mandate" of this Court.
On December 9, 1966, notice of appeal was filed by GC from the Amended Final Decree, and this constitutes Case No. 7477 here.
We have laboriously traced the highlights of the lower Court proceedings from February 16, 1966 to December 9, 1966, but such was necessary to put the case in proper focus. It will be observed that the Court "on its own motion", while Final Decree was on appeal here, added two individual plaintiffs Grass and Noll to the case and endowed them as the moving parties in the litigation, denied all objections of GC to such procedure, struck all of GC's defenses then interposed, and finally entered up an Amended Final Decree retaining all the provisions of the original decree but substituting "in actuality" the individuals Grass and Noll as beneficiary plaintiffs and declaring therefore that Ch. 65-299 was "inapplicable to this cause". We cannot sanction such procedure. We therefore reverse the Amended Final Decree and will ourselves determine the applicability of Ch. 65-299.
In the first place, the revamping of the parties, the issues, and the proceedings in the lower Court was beyond the purview of our per curiam order of February 16, 1966. We have hereinbefore set out the pertinent portion of our remand order because it, in so many words, circumscribes the extent and scope of the lower Court's authority upon the temporary remand. It is implicit that the only purpose of this Court, as we stated, was to "temporarily relinquish jurisdiction" to enable the lower Court to initially review the applicability of the 1965 Act to the case as it then existed, and "for reconsideration and redetermination of the issues that may arise in view of the 1965 Act".
Such "issues" were quite obviously only those affecting the parties to the cause at the time of Final Decree, and would only embrace the constitutional validity of the 1965 Act (which was the only contention made here of non-applicability of the Act to the existing litigation), and if applicable thereto, a reassessment of the extent of forfeiture by GC. Despite the unfortunate looseness of language in our per curiam order, it did not convey any authority or intimate any intendment that the lower Court could transform and reshape the entire proceedings therein from the complaint to the final decree, both inclusive. Only a formal mandate from this Court could have imparted such authority, and then only in strict conformity with directions therein contained.
Incidentally, considerable mention has been made of "the mandate" from this Court. In the motion to strike GC's defenses to the amended complaint TS used the language "pursuant to mandate of the appellate Court" no less than eight times. And in the order of August 26, 1966, the Court itself mentioned "the mandate of the District Court of Appeal" and "the mandate remanding this cause", and in the Amended Final Decree used the language "in accordance with the Appellate Mandate" and "in accordance with the mandate of said Court".
This Court had never issued a mandate in this cause. If such mandate had been issued it would necessarily have been predicated *382 upon some final, definitive action upon the merits of the case. Such would have returned the Final Decree to the trial Court, thereby transferring jurisdiction over the decree back to that Court. The Final Decree has never left this Court since it was appealed here on March 25, 1964. Since that date, no other Court has had jurisdiction of the decree or the right to change it or tamper with it in any way. Therefore, the lower Court had no jurisdiction or authority to enter any Amended Final Decree, certainly not one which materially altered the original decree.
The lower Court held, in its order of June 27, 1966, and in the subsequent Amended Final Decree, that Rules 1.15, 1.17, and 1.18, F.R.C.P., 30 F.S.A. permitted the amendments made, as to parties, pleadings, issues, etc. These Rules provide generally for amendments to pleadings under varying circumstances "when justice so requires". But such Rules apply patently only to cases that are pending in the trial Court and while the trial Court has jurisdiction. As stated in Rule A (now Rule 1.010), "these rules are applicable to all suits of a civil nature * * * in the Circuit Courts * * *". When otherwise allowable, the amendment Rules may be utilized only while the trial Court has jurisdiction of the case. And conversely, when the Court has lost jurisdiction of the case, they may not be applied, for the simple reason there is nothing to apply the Rules to.
The rule is firmly established in this State that the trial Court loses jurisdiction of a cause after a judgment or final decree has been entered and the time for filing petition for rehearing or motion for new trial has expired or same has been denied. Davidson v. Stringer, 1933, 109 Fla. 238, 147 So. 228; Batteiger v. Batteiger, Fla.App. 1959, 109 So.2d 602; State ex rel. Seaboard Air Line R. Co. v. Kehoe, Fla.App. 1961, 133 So.2d 459, and Mid-State Homes, Inc. v. Ritchie, Fla.App. 1966, 181 So.2d 725. When a notice of appeal has been timely filed jurisdiction of the cause then vests absolutely in the appellate Court until such appeal has been finally disposed of by affirmance, reversal, or dismissal; subject only, of course, to a mere temporary relinquishment of jurisdiction for some specified, exceptional purpose, such as here.
Secondly, while the amendments as allowed by the lower Court were profuse, they still did not warrant the Amended Final Decree even from the standpoint of pleading. Equitable estoppel alone would preclude such change of position. United Contractors, Inc. v. United Const. Corp., Fla.App. 1966, 187 So.2d 695; Hodkin v. Perry, Fla. 1956, 88 So.2d 139; Forsythe v. Speilberger, Fla. 1956, 86 So.2d 427; Hotel China & Glassware Co. v. Board of Public Instruction of Alachua County, Fla.App. 1961, 130 So.2d 78; Lyle v. Hunter, 1931, 102 Fla. 972, 136 So. 633; 31 C.J.S. Estoppel § 108, p. 548, et seq. The most elaborate and detailed alterations were made in the Amended Final Decree to put the individuals Grass and Noll "in the shoes" of TS, but the only change made in the complaint was "by adding G.E. Grass and Richard A. Noll as parties plaintiff herein." This left the body of the complaint intact as originally filed, which included the following sworn allegations:
(1) "the defendant [GC] loaned to the plaintiff [TS] the principal sum of $568,705.73 and as one of the conditions of making said loan, did wilfully * * * accept an additional * * * sum of $125,267.82" which was "greater than twenty-five percent (25%) per annum upon the principal sum loaned";
(2) that "in order to extract" the interest aforesaid, "the defendant [GC] devised a scheme and device to circumvent the usury laws * * * and required the plaintiff [TS] to meet the following conditions: [then follow 7 conditions allegedly imposed by GC upon TS];

*383 (3) that because of "the loan charges exacted" and the "scheme and device" aforesaid "plaintiff [TS] is entitled to the forfeiture by defendant [GC] of the entire principal and interest charged";
(4) that "plaintiff [TS] * * * was required to indemnify * * * the * * * individual guarantors [Grass, Mrs. Grass, Noll and J.N. Greene, Jr.] * * * from any and all loss, cost or expense arising out of * * * the above-described personal guarantees and mortgages given by said individuals";
(5) that "in accordance with the above requirements * * * plaintiff [TS] did * * * assign to defendant [GC] * * * commercial paper having a total face value of $831,040.61";
(6) that "plaintiff [TS] has effected the repurchase from defendant [GC] of numerous accounts receivable * * * in default" but that "defendant [GC] has * * * refused * * * to * * * reassign and deliver to plaintiff [TS] the repurchased * * * commercial paper";
(7) that "defendant [GC] wrongfully holds the personal guaranty * * * and the real property mortgages" beforementioned "for which plaintiff [TS] is liable over by indemnity" to the individuals Grass, Noll and Greene; and
(8) that "a complete * * * discovery and accounting of the transaction between the parties [TS and GC] are necessary to determine * * * the rights of the parties [TS and GC]". The prayers were in each instance for the relief of TS as a corporation.
The only evidence adduced in the cause, and it consisted of many volumes, was upon the issues made up between TS and GC, not between any individuals and GC. The findings of the Court in the Final Decree were all in favor of TS, not in favor of any individuals. And the decretal portion granted relief only to TS, not to any individuals (who actually had formerly been referred to as "guarantors" or "indemnitees").
As before stated, no additional testimony was taken during the time between the two decrees. All motions of GC protesting the amending procedures during that interim were denied. All defenses urged by GC were stricken. Yet the Court in the Amended Final Decree made findings and orders completely at variance with those in the original decree which the evidence had established.
It is true that this Court, in its order of February 16, 1966, permitted the lower Court to "allow or decree such amendments or alterations as are appropriate", but this obviously contemplated only such as to bring the case within the purview of the 1965 Act. This meant changes only in the computation of the total amount forfeitable by GC if the lower Court held the Act constitutional and otherwise applicable to GC. And instead of authorizing such a drastically re-worked Amended Decree as was entered, this Court merely directed "the attorneys for the parties * * * to advise this Court of such disposition by appropriate motion or petition".
Lastly, we take up the question of (1) the constitutionality of Ch. 65-299 and, (2) if upheld, the effect of said Act upon the instant litigation.
The constitutional question was not decided in the lower Court, and no errors thereon assigned here by any party, yet we feel constrained to settle the point inasmuch as it was raised initially here by a "suggestion" of TS that it was unconstitutional, before the 1966 remand. And in doing so, we do not infringe upon the jurisdiction of the Supreme Court, for the reason that it is so initially decided here.
We hold the Act constitutional. The subject matter of usurious interest is exclusively statutory. The regulation, *384 and the extent of it, is and has always been in the hands of the legislature. Therefore, the 1965 legislature had full authority to enact any law modifying (or even repealing, if so desired) the existing statutory provisions respecting usury and the forfeiture penalties therefor. Clark v. Grey, 1931, 101 Fla. 1058, 132 So. 832; Sodi, Inc. v. Salitan, Fla. 1953, 68 So.2d 882; Matlack Properties, Inc. v. Citizens & Southern National Bank, 1935, 120 Fla. 77, 162 So. 148; and Yaffee v. International Company, Fla. 1955, 80 So.2d 910. And the general rule is in accord. 16 C.J.S. Constitutional Law § 255, p. 1247, et seq.; Ewell v. Daggs, 108 U.S. 143, 2 S.Ct. 408, 27 L.Ed. 682.
As to applicability of the 1965 Act, the over-all issue in this litigation since its inception has been whether GC should forfeit its alleged principal and/or interest in its transactions with TS, dependent upon a judicial determination of whether it was a series of loans or sales. The suit was originally filed in April, 1962, pursuant to F.S. § 687.07 F.S.A., which provides for the forfeiture of the entire sum, both principal and interest, "to the party charged such usurious interest", where the interest charged is wilful and amounts to more than 25% per annum. The ultimate main relief sought by the original complaint was and is a money judgment for all principal and interest charged by GC to TS on the transactions. Thus, it was clearly an action to enforce an inchoate statutory civil penalty against an alleged usurious corporate lender and in favor of a corporate borrower.
The law seems well established that, in such type action, the statutory provision relied upon creates no vested substantive right but only an enforceable penalty. The penal nature of remedies provided by the usury statutes is well recognized. First Mortgage Corporation of Vero Beach v. Stellmon, supra, and such penalties enjoy no common law or constitutional protection or status. Therefore, until such penalties are merged into a final money judgment, or affirmed on appeal, they possess no immunity against statutory repeal or modification. This is so because until that time the statutory remedy of forfeiture is not vested. 16 C.J.S. Constitutional Law § 256, p. 1248; 23 Am.Jur. 632.
In the case of Coe v. Muller, 1917, 74 Fla. 399, 77 So. 88, the Supreme Court said:
"Usury being merely a statutory defense, not founded upon any commonlaw right, either legal or equitable, it is clearly within the power of the Legislature to take it away.
* * * * * *
The defense of usury is in the nature of a penalty or forfeiture, and may at any time be taken away by the Legislature, in respect to previous as well as subsequent contracts, without trenching upon any vested right.
* * * * * *
Usury statutes do not affect the obligation of the contract, but pertain to the remedy only, by giving to the debtor the privilege of avoiding his contract when usurious, and their repeal, without a saving clause, takes away such privilege, even as to contracts previously made."
The rule is based upon the premise that a penalty for usury was unknown at common law, it being entirely one of statutory regulation and prohibition. See Matlack Properties, Sodi, Inc. and Yaffee. Thus, a repealing or amendatory statute, without a saving clause, abates existing penalties for usury pro tanto. Coe v. Muller, supra; Grammer v. Roman, Fla. App. 1965, 174 So.2d 443, a 2nd District case; and 50 Am.Jur. 535, et seq. In Yaffee the Supreme Court held that such a statute
"* * * operates pro tanto as a repeal of any existing statutes providing for *385 defenses of usury, and protects from their operation, as though the usury statutes never existed, loans made to corporations at rates of interest which would otherwise be unlawful. [Cases cited]."
And the rule of remission would be applied retrospectively even if there had been a final money judgment in the original Final Decree here appealed. It would still be abated pro tanto. Penalties and other statutory remedies are abated by legislation adopted during the pendency of an appeal from a judgment predicated upon such penalty. 23 Am.Jur. 634; 50 Am.Jur. 537; 5B C.J.S. Appeal & Error § 1841, p. 248; 16 C.J.S. Constitutional Law § 256, p. 1248; 82 C.J.S. Statutes § 439, p. 1013, et seq. As stated in 82 C.J.S. Statutes § 439b., p. 1014
"Since there can be no vested right to a penalty before final judgment, * * * the repeal of a statute imposing a penalty operates to defeat all actions pending for its recovery, * * *; and so strictly is this rule enforced that it defeats a pending action, even where the repealing act is passed after verdict or pending an appeal from a judgment of the trial court." (Emphasis supplied).
And by the Supreme Court in Pensacola & A.R. Co. v. State, 1903, 45 Fla. 86, 33 So. 985:
"The law seems to be quite clearly settled that in actions of a penal character, depending upon a statute, the repeal of the statute pending an appeal will deprive the appellate court of any power to render a judgment by which this penalty may be enforced, and that the effect of a repealing statute is to obliterate the statute repealed as completely as if it had never been enacted, except for the purpose of those actions or suits which were commenced, prosecuted and concluded whilst it was an existing law, and that an action cannot be considered as concluded while an appeal therein is pending before an appellate court having jurisdiction to review it."
Summarizing, and applying the rationale of the foregoing to the case at hand, F.S. § 687.07 F.S.A. must yield to Ch. 65-299 to the extent of conflict. § 687.07 provides for forfeiture of both principal and interest upon a loan where the interest wilfully charged is more than twenty-five percent per annum, irrespective of whether the lender or borrower is an individual or a corporation. Ch. 65-299, now F.S. § 687.11 F.S.A., provides that, as to a corporation borrower, where the interest exceeds fifteen percent per annum no such corporation "shall be required to pay any interest, and in such event all interest shall be forfeited". This is in sub-section (1) of the Act. This might not be determinative, but sub-section (2) provides that "all laws or parts of laws in conflict herewith and all other statutory penalties for usury applicable to loans to corporations are hereby repealed". (Emphasis supplied). This, of course, includes § 687.07 and the penalties therein contained, as to "loans to corporations". And we have already held that, under the issues made up in the lower Court, TS was the borrower. The 1965 Act therefore applies. We here interpolate that we neither entertain, much less express, any views upon the propriety or the wisdom of the 1965 Act. We only determine its validity and applicability.
We therefore hold the lower Court in error in its orders entered upon remand, and reverse the Amended Final Decree, with directions that such previous orders and the proceedings had and taken thereon be vacated and set aside.

Case No. 67-106
We come now to consideration of the Final Judgment entered by the lower Court. As hereinbefore mentioned, the Final Decree of December 16, 1963, ordered *386 an accounting "for the purpose of determining the amount of recovery" of TS. On February 5, 1964, a Special Master was appointed, and on March 16, 1966, filed a "preliminary order", reporting that the parties had agreed that (1) the total interest received by GC was the sum of $125,002.00, and that (2) the total amount collected and retained by TS on assigned commercial paper was $19,689.41; but that the following matters were in dispute: (1) the principal amount of the loan, (2) the unpaid amount of reserve retained by GC, (3) the unpaid balance owed by TS to GC on the loan secured by the chattel mortgage, and (4) the assessable Court costs.
After taking evidence the Master filed his final report, and on February 20, 1967, the Court entered Final Judgment against GC in the total amount of $710,911.08, for which "let execution issue". From that judgment GC has appealed here, to form the basis of case No. 67-106.
The amount of $710,911.08 was arrived at in the Final Judgment by the following computations:

Principal of the "loans" $584,998.43[3]
"Interest" charged thereon 125,002.00
"Reserve" retained by defendant after deduction of
 payments collected and retained by plaintiff 10,496.16
Court costs 2,331.50
 ___________
 $722,828.09
Less chattel mortgage balance 11,917.01
 ___________
 Total Judgment $710,911.08

Not challenged here are the following items: $125,002.00 interest charged; $2,331.50 Court costs; and $11,917.01 balance due GC on chattel mortgage. And while the item of $584,998.43 as principal is disputed as to amount, such is now without consequence in view of disposition of case No. 7477, eliminating forfeiture of principal.
This leaves in contention only the item of $10,496.16. This figure was computed by taking the stipulated amount of $37,626.49 as reserve retained by GC, deducting therefrom $19,689.41 as agreed unremitted collections by TS upon previously assigned paper, and deducting also $7,440.92 as agreed amount of defaulted assigned accounts after suit was filed.
So, actually there is no dispute as to the net amount of such item being $10,496.16. The only difference is that GC contends it is not a proper part of the forfeiture and therefore should not have been included in the final judgment. GC asserts that if this retained reserve must be paid back to TS in addition to the forfeiture of interest it would, in effect, be a "double penalty", because § 687.07 F.S., under which the suit was originally brought, provided for forfeiture only of principal and interest (now only interest under the 1965 Act).
The fallacy of such contention is that the retained reserve is not a forfeiture and its payment back to TS is not a penalty. The reserve was the property of TS, although in possession of GC, and any portion thereof that was unused or *387 unapplied is payable back to TS, simply because it belonged to TS. So the net amount of $10,496.16, as agreed amount of retained reserve after stipulated adjustment, is a proper part of the judgment.
The total amount of the Final Judgment and the computations made by the Court as to the various items was therefore correct, except as to the item for principal, which is not forfeitable under the 1965 amendment. This would reduce the total amount of the judgment from $710,911.08 to $125,912.65, and the Final Judgment should accordingly be for such amount. Also, in accordance with our disposition of case No. 7477, the judgment should be in favor of Tel Service Co., Inc., a corporation, and the individuals Grass and Noll eliminated.
The Final Judgment appealed in this Case No. 67-106 is therefore reversed with directions to the lower Court to enter judgment in the amount of $125,912.65 against General Capital Corporation, a Florida corporation, and in favor of Tel Service Co., Inc., a Florida corporation, and to eliminate the individuals Grass and Noll therefrom.
HOBSON, J., and HODGES, JOHN G., Associate Judge, concur.
NOTES
[1] See infra, marginal note 3.
[2] 687.07 Forfeiture and penalty in case of excessive interest or charges
Any person, or the agent, officer or other representative of any person, lending money in this state who shall willfully and knowingly charge or accept any sum of money greater than the sum of money loaned, and an additional sum of money equal to twenty-five per cent per annum upon the principal sum loaned, by any contract, contrivance or device whatever directly or indirectly, by way of commissions, discount, exchange, interest, pretended sale of any article, assignment of salary or wages, inspection fees or other fees or otherwise, or for forbearing to enforce the collection of such moneys or otherwise, shall forfeit the entire sum, both the principal and interest, to the party charged such usurious interest, and shall be deemed guilty of a misdemeanor, and on conviction, be fined not more than one hundred dollars, or be imprisoned in the county jail not more than ninety days.
[3] This figure is arrived at as follows: $494,499.00 paid in cash by GC for the total commercial paper assigned (having a face value aggregating $831,854.59), plus $90,499.43 representing "repurchases" by TS of defaulted items. However, the percentage of interest must be computed upon the amount of $494,499.00 which was the total cash received by TS for the paper assigned.