112 So.2d 406 (1959)
Moe SILVERSTEIN and Minnie Silverstein, his wife, Appellants,
v.
Clinton C. WAKEFIELD and Ruth Wakefield, his wife, Appellees.
No. 58-691.
District Court of Appeal of Florida. Third District.
May 21, 1959.
Rehearing Denied June 17, 1959.
Monroe Gelb, Miami, for appellants.
Julius H. Erstling, Miami, for appellees.
HORTON, Judge.
This is an appeal from a final decree in chancery in which the chancellor found that a $2,000 mortgage and note, given by the appellees to the appellants, was usurious.
The appellees were the owners of certain real property in Dade County, Florida, and desired to obtain a $2,500 loan thereon. In response to an advertisement of the Sunshine Mortgage Company, mortgage brokers, the appellees applied for a $2,500 loan. The Sunshine Mortgage Company then solicited the appellants to lend $2,500 on the appellees' property. After looking at the property, the appellants advised the mortgage company that they would lend $2,000 on the property at 10% interest. This was agreeable with the appellees and subsequently they consummated a $2,000 loan evidenced by a note in that amount, secured by a mortgage on their real property, payable at the rate of $30 per month for three years, with the balance payable at the end of the three-year period with interest at 10%. Prior to the showing of the property to the appellants by an employee of the mortgage company, the appellees had entered into a written contract of employment whereby they were to pay to the mortgage company $600 as brokerage and expenses for obtaining the loan. As a result of the transaction, the appellees received the total sum of $1,400 from the $2,000 loan. After *407 making 33 monthly payments in the sum of $30 each, or a total of $990, the appellees instituted a suit, the purpose of which was to declare the note and mortgage null and void on the ground that the same was usurious. The appellants answered the complaint and also counterclaimed, praying the court to grant them a decree of foreclosure for a balance of $1,564.75 allegedly due under the mortgage and note then in default. The cause went to trial before the chancellor and resulted in the decree from which this appeal was prosecuted.
The appellants' main attack on the decree centers around the finding by the chancellor in his decree that appellants and the Sunshine Mortgage Company conspired to extract from the appellees an exorbitant brokerage commission in connection with the mortgage loan while said mortgage company was acting as agent of the appellants. The chancellor in effect by his decree found that the Sunshine Mortgage Company was the agent of the appellant-lenders, and that, as such, the transaction was usurious. The evidence and testimony adduced at the trial disclose that the appellants were solicited by the Sunshine Mortgage Company to make the loan; that the appellants agreed to make the loan and deposited with their attorney, who had no connection with the Sunshine Mortgage Company, the sum of $2,000; and that thereafter the appellants appeared to have nothing further to do with the transaction. The attorney for the appellants then proceeded to deduct $50 for his fee from the $2,000 deposited with him by the appellants, and remitted the balance of $1,950 to the Sunshine Mortgage Company to be disbursed to the appellees. There was no evidence that the appellants received any rebate or refund from the mortgage company or any other consideration from anyone, other than the 10% interest agreed to be paid on the loan by the appellees under the terms of the note and mortgage. There was evidence of a failure on the part of the Sunshine Mortgage Company to account for the sum of $150 listed in the closing statement of disbursement as commission, but no indication that appellants received any part of it. The Sunshine Mortgage Company did, after the execution of the mortgage and note, collect the monthly payments for the appellants and remit the same to them. Other than that, there appear to be no contacts between the appellants and the mortgage company. This was the first transaction in which the appellants had supplied mortgage money through the Sunshine Mortgage Company, although it does appear that they subsequently made loans through that company to borrowers.
The chancellor in his decree, inter alia, said:
"Agency in a case of this kind is extremely difficult to prove, especially where the parties on one side are shrewd business people and those on the other are ignorant working folk. As above pointed out, the transaction was clearly usurious. There is no adequate way of punishing the Sunshine Mortgage Co. or its officials. Silverstein's testimony was not at all convincing. While he categorically denied any connection with the transaction, except the payment of $2,000.00 to his attorney, Mr. Keith, his petulance and irritability on the stand shook his testimony considerably."
Obviously, from his statement, the chancellor was incensed at the overreaching that had been practiced on the appellees. However, no matter how sympathetic the chancellor, or we, may feel toward the position of the appellees, nevertheless, we are required to apply certain principles of law to the facts. In this instance, the chancellor's decree collides head on and conflicts with certain well established principles laid down by the Supreme Court of this State. The facts in this case are almost parallel to the facts in the cases of Shaffran v. Holness, Fla. 1957, 93 So.2d 94, and Shaffran v. Holness, Fla.App. 1958, 102 So.2d 35. In these cases there *408 was evidence of a loan application and a brokerage contract, by the terms of which the borrowers engaged the United Mortgage Company to act for them in procuring a second mortgage loan, and agreed to pay United Mortgage Company a certain sum for its services and the costs incident to the loan. An attorney handled the transaction on behalf of his client after the client had deposited the total sum of the monies to be loaned with his attorney. The court said (102 So.2d 35, at page 39):
"In Jones v. Hammock, 131 Fla. 321, 179 So. 674, 675, it was said, `This court has held that one of the requisites of a usurious transaction is that there must exist a corrupt intent to take more than the legal rate for the use of money loaned (Clark v. Grey, 101 Fla. 1058, 132 So. 832), and that usury is largely a matter of intent and is not fully determined by the fact of whether the lender actually gets more than the law permits, but whether there was a purpose in his mind to get more than legal interest for the use of his money (Benson v. First Trust & Savings Bank, 105 Fla. 135, 134 So. 493, 142 So. 887, 145 So. 182). Also to work a forfeiture under the statute the principal must knowingly or wilfully charge or accept more than the amount of interest prohibited. Chandler v. Kendrick, 108 Fla. 450, 146 So. 551, 552.' Argintar v. Lydell, 132 Fla. 45, 180 So. 346.
"One of the established principles governing the payment of commissions to agents in connection with loans is that `when one negotiates a loan through a third party, with a money lender, and the latter, bona fide, lends the money at a legal rate of interest, the contract is not made usurious merely by the fact that the intermediary charges the borrower with a heavy commission; the intermediary having no legal or established connection with the lender, as agent.' 52 A.L.R.2d 708. * * *" (Emphasis supplied.)
Although we conclude that the chancellor in the case at bar was in error in his application of the law to the evidence, we nevertheless do not wish to be understood as sanctioning transactions of this character, which, on their face, though legally correct, are unconscionable. Certainly the chancellor was justified in being incensed over a transaction involving a loan of $2,000 where the undisputed testimony clearly showed that the borrower received no more than $1,400. Then after paying $990 on a $2,000 loan, he was still faced with a demand for more than $1,500. However, it is not out province to recast the law, and particularly that which is governed by specific statutory enactments. In such instances, the remedy lies with the legislature.
Accordingly, the decree appealed from is reversed, and the cause remanded for further proceedings not inconsistent herewith.
Reversed and remanded.
CARROLL, CHAS., C.J., concurs.
PEARSON, J., dissents.
PEARSON, Judge (dissenting).
The well-reasoned opinion of the majority is undoubtedly correct if the case is viewed as one involving an ordinary borrower and broker relationship. It is my view that the evidence and the findings of the chancellor thereon established an entirely different situation. In the delineation of this view the chancellor set forth in his final decree:
"By amendment to the complaint, Sunshine Mortgage Co., was made a party, and it was alleged that it, with the defendants Silverstein, conspired to extract from the plaintiffs a large and exorbitant brokerage commission in connection with the mortgage loan while it was acting as agent of the defendants Silverstein with the object of avoiding the provisions of Section 687.03, Florida Statutes [F.S.A.], relating to usury.

*409 * * * * * *
"In addition to interest at 10%, the Sunshine Mortgage Co. charged the borrowers $600.00 on the $2,000.00 loan. This figure, according to the closing statement (Plaintiff's Exhibit 3), is broken down as follows:

 Abstract $ 21.00
 Recording 2.20
 Stamps 2.00
 Int. Tax 4.00
 _______
 29.20
 Lawyer's fee 100.00
 Commission 150.00
 Amortization Sch. 1.35
 Brokerage 319.45
 _______
 $570.80

"Of the foregoing amounts the defendants accounted for $80.00 of the $100.00 lawyer's fee, but not the remaining $20.00. And there was a total failure to account for the $150.00 commission.
* * * * * *
"The plaintiffs put in evidence a letter from Sunshine Mortgage Co., signed by Mrs. Waterman, dated March 25, 1958, in which it is said: `We, as servicing agent for your mortgage account, will no longer collect monthly payments' etc. Of course, it is well settled that agency may not be established by the declaration of the alleged agent standing alone, but coupled with other facts and circumstances, such declaration may be helpful in establishing agency. 31 C.J.S., Evidence § 344, p. 1117. In this case there is the testimony of Gerard Ehrich, an attorney, who identified Plaintiffs' Exhibits 8 and 9 and said, in substance, that they were brought to him by a client who was considering engaging Sunshine Mortgage Co., to negotiate loans for him. When the client showed these letters to Mr. Ehrich, particularly the notations thereon, `Bonus $150' and `Bonus $100' and the signature of one of the Watermans appended thereto, he called up Mrs. Waterman on the telephone at the number listed on the instruments, and she identified herself. Continuing, Mr. Ehrich says:
"A. Subsequent to the examination of these instruments which I hold in my hand, I made a telephone call to Sunshine Mortgage Co., at the phone number listed on these particular instruments. The phone was answered by a woman who, to the best of my recollection, identified herself as Mrs. Waterman. The reason the name strikes me and I can recall it is the fact there is writing on this particular instrument in ink bearing a signature that appears to be Waterman. I discussed with her the ink notations on both. One instrument bearing ink notations  bonus $150  with a signature thereon. The other bearing a notation  bonus $100  with a signature thereon.
"Mr. Gelb: I will object to the witness testifying as to anything on a document not in evidence.
"Mr. Erstling: It will be tendered.
"A. Mrs. Waterman told me that the mortgage had been processed. That the client seemed to be satisfied with the mortgage. Now, this is the best of my recollection. The question of the bonuses were quite natural and common, and that is one of the reasons the people took the mortgages and she did not get complaints along these lines. I told her it was not my practice to approve loans which contained on their face, in my opinion, rates of interest in excess of that legally allowed by the laws of the State of Florida. I think that I had a subsequent conversation with either Mr. Waterman or a gentleman who called up and he tried to impress me.
"Mr. Gelb: I will object to conversation with someone he can't identify.

*410 "The Court: Overruled.
"A. Someone who tried to impress me that the deal had been consummated and costs had been incurred. I once again repeated I wasn't interested in that and would not advise my client to go through with the transaction in spite of the fact they had incurred some costs. That they could do whatever they wanted to about what the costs were but I wasn't going to advise my client to go through with the deal. (Pages 58-60.)
"Agency in a case of this kind is exceedingly difficult to prove, especially where the parties on one side are shrewd business people and those on the other are ignorant working folk. As above pointed out, the transaction was clearly usurious. There is no adequate way of punishing the Sunshine Mortgage Co. or its officials. Silverstein's testimony was not at all convincing. While he categorically denied any connection with the transaction, except the payment of $2,000.00 to his attorney, Mr. Keith, his petulance and irritability on the stand shook his testimony considerably. He wound up his cross-examination with these questions and answers:
"Q. But, so far as you were concerned, Mrs. Waterman was acting for you in the collection of these payments and the collection of the mortgage account? A. Why are you harping on the same thing? I answered you. Why do you keep on the same thing?
"The Court: It is a perfectly proper question. Answer it.
"The Witness: Would you ask it again so I will get it straight, please?
"A. Well, I don't know  what was it?
"Q. As far as you were concerned, Mrs. Waterman was acting for you in the collection of the payments for this mortgage account? A. I don't know whether she was acting for me or not." (Page 90.)
It is evident from the findings of the chancellor that there was collusion, that is, there was co-operation between the mortgage broker and lender to deceitfully lead the borrower, who answered the advertisement of "money to lend", into a trap, fraught with unconscionable surcharges. Certainly fraud, deceit, or collusion, are always a ground for equitable interference. See Sandquist & Snow v. Kellogg, 101 Fla. 568, 579, 133 So. 65, 136 So. 235; cf. Schmitt v. Bethea, 78 Fla. 304, 82 So. 817; Busch v. Baker, 79 Fla. 113, 83 So. 704; Scheuer v. Balik, 130 Fla. 255, 177 So. 731; Hauer v. Thum, Fla. 1953, 67 So.2d 643.
I also think the following fine language of Mr. Justice Root, speaking for the Supreme Court of Washington in Stone v. Moody, 41 Wash. 680, 84 P. 617, 619, 85 P. 346, 5 L.R.A.,N.S., 799, is applicable to the instant situation:
"Where it is to the court perfectly plain that one party has overreached the other and has gained an unjust and undeserved advantage which it would be inequitable and unrighteous to permit him to enforce, we do not believe that a court of equity should hesitate to interfere, even though the victimized parties owe their predicament largely to their own stupidity and carelessness. It is well known that many good people and people of average or greater intelligence are sometimes duped and misled by the skill, cleverness, and articles of those who are adepts in the matter of deceiving their fellow men; and courts should not throw about schemers of this kind a protection that will tend to encourage the practice of their arts. Such people should not find encouragement in the thought that, by keeping their machinations within the letter of the law, they may find sanction for their practices and reap the reward of their craftiness. To the victim it is of little import whether his property is *411 taken from him by a bold and forcible robbery or by an ingenious and unsuspected deception. The injury to him is the same; and the evil effect of court decisions which permit the wrongdoer to enjoy the fruits of his chicanery is of no small import when viewed from the standpoint of public policy. It is not the function of courts to make contracts for parties, or to relieve them from the effects of bad bargains. But where the simplicity and credulity of people are taken advantage of by the shrewdness, overreaching and misrepresentation of those with whom they are dealing, and they are thereby induced to unwittingly [do] something the effect of which they do not intend, foresee, or comprehend, and which, if permitted to culminate, would be shocking to equity and good conscience, we think a court of equity may with propriety interpose."
I would therefore affirm the final decree.