275 So.2d 311 (1973)
The W.B. DUNN CO., INC., et al., Appellants,
v.
MERCANTILE CREDIT CORPORATION, a Texas Corporation, Appellee.
No. R-36.
District Court of Appeal of Florida, First District.
April 3, 1973.
*312 E.C. Deeno Kitchen of Ervin, Varn, Jacobs & Odom, Tallahassee, for appellants.
Julius F. Parker, Jr., of Madigan, Parker, Gatlin & Swedmark, Tallahassee, for appellee.
RAWLS, Acting Chief Judge.
Were certain assignments of installment loan contracts from appellants, W.B. Dunn Co., Inc., W.B. Dunn and Eugenia Dunn [hereinafter referred to as Dunn], to appellee, Mercantile Credit Corporation, a Texas corporation [hereinafter referred to as MCC], security for loans of money to Dunn or a sale of such contracts to MCC? And if the transactions were determined to be loans, was the interest computed thereon usurious? These are the two principal questions posed by Dunn's appeal from a final judgment finding the transactions to be a sale.
The trial court in an extensive eighteen-page final judgment containing detailed findings of fact and conclusions of law, entered a declaration of the rights and liabilities of the parties. The parties have not taken issue with a portion of the final judgment; thus, we are only concerned with the foregoing points.
Facts material to our consideration of the issues being reviewed are extracted from the final judgment entered by the trial court.
Dunn is and has been for about 25 years engaged in the retail furniture business at Monticello, Florida, and nearby places in Georgia and Florida. A substantial part of its business involves sales on a deferred payment basis evidenced by notes or other marketable paper providing for future payment in regular periodic installments. Prior to commencement of its dealings with MCC in 1964, Dunn obtained financing by selling its installment contracts to purchasers of same who thereafter would make collections of the installments directly from the debtors. This system had its disadvantages to Dunn because the purchaser on the deferred payment plan would make his payments elsewhere than the retail store and there would be no opportunities to make other sales to such customer.
In 1964, contact was made by Dunn with MCC for financing the installment contracts. Under the system employed the installment purchaser would have no dealings with MCC but would make payments to Dunn, and thus rapport and contacts were maintained directly with such customer. In 1964 and subsequently, a large volume of business was transacted between the parties and it was not until 1970 that difficulties arose which ultimately resulted in this complex lawsuit.
The instruments executed and deemed significant are:
1. A "guaranty" dated March 16, 1964, signed by Mr. and Mrs. Dunn, separately, in which the "guarantor" guarantees MCC "the prompt payment when due of any and all liability or indebtedness" of the Dunn Co. to MCC "now existing or which hereafter may arise". The obligation of the guarantor is an "absolute, unconditional and continuing guaranty" of payment of any indebtedness and any extensions, renewals, or substitutions therefor.
2. A "Financing Statement Security Agreement", dated January 1, 1967, by Dunn Co. to MCC, which "assigns and grants" to MCC a "security interest" in "(a) all inventory; of (b) all contract rights of debtor; (c) all accounts receivable; (d) all instruments, documents ... chattel paper, deposits, cash or *313 other property owned by debtor ... which are now or hereafter be in possession of [MCC]" and "proceeds and products of the foregoing". It recites that from time to time MCC will lend certain amounts to Dunn and that the security interest is given "to secure all liabilities of all kinds ... whether now existing or thereafter arising, absolute or contingent, joint or several, due or to become due". This instrument was recorded in Jefferson County, Florida, and Thomas County, Georgia. We pause here to note that no liabilities existed on the part of Dunn at the time this instrument was recorded save any which might arise out of the transfer to MCC of installment contracts. More than a year and one-half later, on August 15, 1968, Dunn borrowed a sum of money from MCC and on January 1, 1970, it borrowed another sum of money from MCC evidenced by promissory notes. These sums are not included in this appeal, save as evidence in construing the "security agreement".
3. Periodically, Dunn would send to MCC a group of installment contracts accompanied by a "contract schedule" on which was listed the contracts being forwarded therewith. A printed agreement executed by Dunn on the reverse side of the "contract schedule" provided for recourse and for value received that Dunn does hereby bargain, sell and transfer to and assign to MCC all of the installment and/or conditional sales contract agreements listed on the "contract schedule". Further, contract provisions are for monthly remission by Dunn "all sums due upon all said contracts during the preceding month"; and that if any contract becomes delinquent inasmuch as three payments, or the merchandise for the sale is repossessed, or is prepaid by the maker, Dunn will either repurchase the contract, or "... replace the same with another or other contracts of equal or greater value". It also provided that in addition to a "discount accorded it" MCC had deducted a portion of the principal sum which shall be styled the reserve fund of the dealer. MCC retained the reserve fund with the right to apply it to any liabilities on the part of Dunn from "... this or any other transaction". After discharge of all obligations to MCC, "the balance, if any," of the reserve fund was to be paid to Dunn. The contract on each schedule further provided that "... upon the breach of any provision hereof ... the Company [MCC] may, after written notice to him offer for sale at either public sale all the interest of Dealer [Dunn] in the contracts listed... . At such sale the Company [MCC] may purchase such interest, crediting any amount paid therefor on Dealer's [Dunn] indebtedness to it after paying all reasonable expenses for such sale. Dealer [Dunn] shall remain liable for any deficiency and any excess shall be paid to Dealer [Dunn]." After the sale "all of the records of the Dealer ... shall become the purchaser" who "shall have the right to enter upon the premises of the Dealer to take possession of the contracts and/or to utilize the premises of Dealer to effectuate collection of such contracts."
The trial court in weighing the foregoing documentary evidence and testimony summarized, the following factors supporting Dunn's contention that the transactions involving installment sales payments were loans and not sales, viz: On each schedule of contracts both a discount and reserve were withheld; Dunn was required to repurchase contracts in default by replacing them with new paper (and we observe in equal value or greater); MCC had recourse to reserve fund against Dunn in event of default by a retail purchaser; Dunn accepted payments on the contracts after assignment to MCC; personal guarantees were made by Mr. and Mrs. Dunn; execution and recording of financing statements and security agreements; payment by Dunn of 12 equal monthly payments on the schedules even though individual contracts attached to the schedules provided for payments varying from 6 months to 36 months; presence of "foreclosure language" *314 in assignment of agreement; the discount rate charged was generally adjusted to reflect fluctuations of prime interest rates; and bookkeeping entries of the parties referring to notes and accounts receivable.
The trial court considered the questions posed as one: did the transactions between the parties constitute that of usurious loans? After considering all the facts and circumstances, the court answered the question in the negative. We disagree.
The principles involved are easily stated but are difficult to apply when the relationships of the parties and their dealings with each other have involved a variety of activities over an extended period of time. The first question to be resolved is that of the true nature of the transaction. In Kay v. Amendola, 129 So.2d 170 (2 Fla.App. 1961), it states:
"It is well settled in Florida that the law will look to the substance of the transaction rather than to the form to determine usury.
"Our usury statutes show a clear legislative intent to prevent accomplishment of a usurious scheme by indirection, and the concealment of the needle of usury in a haystack of subterfuge will not avail to prevent its pricking the body of the law into action."
As detailed above, the documentary evidence is replete with language that is associated with a loan. Although the isolated "grant, bargain and sell" is disclosed in the contract schedules, the remainder of this full page "fine print" contract is devoted to that of a loan and is replete with "foreclosure language". Replacement of a defaulted contract with one of equal or greater value certainly is not consistent with a sale. The evidence reflected in this record leads us to the inescapable conclusion that the transactions were loans from MCC to Dunn rather than a sale of the subject installment contracts.
A more troublesome problem is whether the loans were usurious. The trial court reasoned that at the outset the transactions were not tainted with usury and that "... the real problem is whether or not the evidence clearly established bad faith and an unconscionable purpose to take advantage of needy borrowers and exact an unlawful return." It is at this point that we must explore in depth that degree of "corruptness", "bad faith", or "scheming design" that must be proved in Florida to satisfy the statutory penalty visited upon any person or any agent, officer or other representative of any person, willfully violating the provisions of § 687.03; Florida Statutes, F.S.A.
First, usury is largely a matter of intent, which is determined not by whether a lender actually gets more but whether there was a purpose in mind to obtain more than legal interest.[1] The important factor is the willfulness of the lender. And the matter of willfulness is not absolutely closed by the bare statement of the lender that he was unconscious of wrongdoing.[2] Mr. Justice Hobson, speaking for the Supreme Court in Griffin v. Kelly, 92 So.2d 515 (Fla. 1957), adopted with approval the following quotation from Restatement of Contracts, Sec. 529, viz:
"Where the intent of a party to a bargain is to make a loan of money or an extension of the maturity of a pecuniary debt for a greater profit than is allowed by law, the agreement is illegal though *315 the transaction is put in whole or in part in the form of a sale, a contract to sell or other contract."
The foregoing opinion also cited with approval the following statement from 6 Corbin on Contracts, Sec. 1501 at 946, viz:
"The only difference between a lawful transaction of the sort just described and one that is usurious and unlawful is found in the intentions and purposes of the parties; it is the difference between `good faith' and `bad faith'. The parties are themselves permitted to testify as to their purposes and intentions."
In the instant cause, the trial court found inter alia in the final judgment that:
"Though an intent to commit usury is established by proving a purpose to exact an illegal return on a loan, it must be kept in mind that one of the elements of usury is a corrupt intent and that the test is a finding of bad faith."
We first find the test of "corrupt intent" discussed by our Supreme Court in Clark v. Grey, 101 Fla. 1058, 132 So. 832 (1931). The "corrupt intent" was mentioned in Shaffran v. Holness, 102 So.2d 35 (Fla. App. 1958) along with the conjunctive "and" "... that usury is largely a matter of intent and is not fully determined by the fact of whether the lender actually gets more than the law permits, but whether there was a purpose in his mind to get more than legal interest for the use of his money... ." Judge Carroll, speaking for the Third District Court of Appeal in Curtiss National Bank of Miami Springs v. Solomon, 243 So.2d 475 (3 Fla.App. 1971), stated what in our view is the test to be applied to the facts found in the instant cause by the trial judge:
"When the lender has intentionally and purposely done that which amounts to or results in a contract for or the exaction of usurious interest, an argument by the lender that it was not shown the lender intended to violate the usury statute is without merit."
As a prerequisite to making the subject loans, MCC presented Dunn with a series of printed contracts to sign. The "printed contracts" provided that in exchange for the loan, MCC would extract from Dunn a discount plus a reserve. The discount and reserve both fluctuated and the terms of the printed form contracts authorized their increase irrespective of any violation of the usury laws. We find that under the facts of this case the requisite "intent" to consummate a usurious loan was present.
MCC contends that even if a "usurious intent" is present, the instant transactions do not violate the usury laws of this State as they were not usurious on the date of their inception. In Green Ridge Corp. v. South Jersey Mortgage Co., 211 So.2d 70 (2 Fla.App. 1968), in rejecting a similar contention, the Second District Court of Appeal held:
"Appellants' first argument is necessarily founded on the theory that the usurious character of a transaction must be determined or determinable at its inception. However, as was pointed out in Home Credit Co. v. Brown, Fla. 1952, 148 So.2d 257, modifying Fla.App. 137 So.2d 887, the Florida Courts have disregarded such theory. 148 So.2d 257 at 259. The test of usury followed in Florida is not based upon the contingencies inherent in a transaction, but upon what actually develops." [Emphasis supplied]
MCC cannot now take solace in its position that the loan was not usurious at the date of inception.
The parties at trial and on appeal have relied primarily upon Indian Lake Estates, Inc. v. Special Investments, Inc., 154 So.2d 883 (2 Fla.App. 1963), [hereinafter referred to as Indian Lakes], and General Capital Corp. v. Tel Service Co.,[3] [hereinafter referred *316 to as General Capital Corp.], both cases rendered by the Second District Court of Appeal. MCC strenuously urges that Indian Lakes fully supports its position in the case sub judice. Although discussion was had to Indian Lakes by the author of the intent of the parties, it is also apparent from the opinion that the trial judge's decision that the transaction constituted a sale, which was sustained by the appellate court, was bottomed primarily upon the following finding:
"Alaska Oil and Mineral Company, now the owner of all stock of Indian Lake Estates, Inc., acquired it from Leon Ackerman, the then sole stockholder of Indian Lake Estates, Inc., on the basis that the sale by Indian Lake Estates, Inc. of these contracts receivable was a valid sale, not a loan, and that Indian Lake Estates, Inc. had no claim or right to assert any claim against them or against the holders of them. To allow Alaska Oil and Mineral Company through its wholly-owned subsidiary now to assert the defense of usury or counterclaim for penalties under the usury laws would have the effect of this Court's changing the purchase price Alaska Oil and Mineral Company paid Ackerman for his stock and effect an unjust enrichment for Alaska Oil and Mineral Company. Therefore, Indian Lake Estates, Inc. is here estopped to assert the defense of usury or to counterclaim for penalties under the usury statutes."
In the case at bar, we find a factual record that is not analogous to those recited in Indian Lakes, and conclude that same is not applicable.
The General Capital Corp. case is factually in point, for the Court was there concerned with the following factual circumstances: (1) assignment of commercial paper; (2) discount withheld by the lender; (3) a reserve withheld by the lender; (4) reserve to be repaid when the particular paper was paid in full; (5) repurchase of any defaulted paper by the borrower; (6) recourse to the reserve fund in the event contract defaulted; and (7) guaranty by individual stockholders. Each of the foregoing items are found in the instant cause. So, we must conclude that the General Capital Corp. case is a compelling and controlling precedent for the case at bar.
The last matter which we need to discuss is F.S. 520.38, F.S.A. MCC contends that even if the instant transactions and loans and the interest rate extracted are usurious, that F.S. 520.38, F.S.A. renders the usury laws of this State inapplicable to transactions such as those involved in the case at bar.
Section 520.38, Florida Statutes, F.S.A., provides that a retail seller may assign, pledge, hypothecate or otherwise transfer a retail installment contract to any person on such terms and conditions and for such price as may be mutually agreed upon. On examination, said statutory provision gives rise to the question of whether the statute may be implication repeal or supersede or be exempt from or be an exception to the usury statute. The affirmative argumentation that such is the case stems from the express authority for pledging or hypothecating accounts on such terms and conditions as may be mutually agreed upon. Thus, a party could pledge or hypothecate an account and mutually agree with the other party to the payment of interest in an amount exceeding the usury laws. On the surface, such rationale appears sound. However, on deeper inquiry it is realized that interest is not paid or collected on or on account of a pledge or hypothecation. Rather, interest is paid on the loan of money, which loan is secured by a pledge or hypothecation. Therefore, being given a free rein to agree upon terms and conditions of the pledgement or hypothecation does not relate to or concern itself with the interest to be paid on the loan secured by the pledge or hypothecation. Obviously then, the terms and conditions referred to in this section must relate to the circumstances surrounding the giving of the security as opposed to *317 circumstances surrounding the making of the loan. Therefore, we hold that the subject statute does not expressly or impliedly repeal the statutory provisions proscribing the civil and criminal offenses of usury.
We conclude, as a matter of law, that the trial court misconstrued its findings of fact when it determined the transactions in this cause were sales. Further, the trial court utilized an erroneous test as to the question of "usurious intent". The proofs adduced by Dunn were sufficient to impeach the transactions on the ground that they were tainted with the elements of usury. In addition, we have found that F.S. 520.38, F.S.A. does not exempt these transactions from the requirements of our usury laws. The sole question remaining is whether at any point in time the interest extracted by MCC from Dunn did in fact violate the usury laws of Florida. This is a factual determination to be made by the trial court.
Reverse and remand with instructions.
WIGGINTON and JOHNSON, JJ., concur.
NOTES
[1] Du Pont Plaza, Inc. v. Samuel Kipnis Family Foundation, 132 So.2d 352 (3 Fla. App. 1961); Chandler v. Kendrick, 108 Fla. 450, 146 So. 551; Jones v. Hammock, 131 Fla. 321, 179 So. 674; Maule v. Eckis, 156 Fla. 790, 24 So.2d 576; Shaffran v. Holness, 102 So.2d 35 (Fla. App. 1958); Stewart v. Nangle, 103 So.2d 649 (Fla.App. 1958); Silverstein v. Wakefield, 112 So.2d 406 (Fla.App. 1959).
[2] Irv Enterprises v. Atlantic Island Civic Ass'n, 90 So.2d 607 (Fla. 1956)
[3] General Capital Corp. v. Tel Service Co., 212 So.2d 369 (2 Fla.App. 1968), and modified in part 227 So.2d 667 (Fla. 1969).