IN THE COURT OF APPEALS OF TENNESSEE

# FILED

December 9, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

AT KNOXVILLE

E1998-00412-COA-R3-CV

WESTSIDE HEALTH AND RACQUET ) C/A NO. 03A01-9810-CH-00332
CLUB, INC., )
)
   Plaintiff-Appellee,)
)
)
)
)
)
v. ) APPEAL AS OF RIGHT FROM THE
) HAMBLEN COUNTY CHANCERY COURT
            )
)
)
)
JEFFERSON FINANCIAL SERVICES, )
INC., )
)
  Defendant-Appellant.) HONORABLE THOMAS R. FRIERSON,
II,
) CHANCELLOR


For Appellant       For Appellee

RICHARD N. SWANSON   CLINTON R. ANDERSON
Morristown, Tennessee  Morristown, Tennessee

THOMAS F. BLOOM
Nashville, Tennessee

# OPINION

REVERSED AND REMANDED

Susano, J.

Westside Health & Racquet Club, Inc. ("Westside") filed this action against Jefferson Financial Services, Inc. ("Jefferson"). Westside's theory of its claim -- which theory was adopted by the trial court -- is that Westside's transfer to Jefferson, over time, of some 495 installment sales contracts was, in each case, part and parcel of a usurious loan made by Jefferson to Westside, rather than a sale of the contract. The trial court awarded Westside damages of $68,519.71 for usurious interest, which was enhanced by a further award of pre-judgment interest pursuant to T.C.A. § 47-14-123 (1995)[1]. Jefferson appeals, raising several issues. The issue that we will focus on can be stated thusly: Does the Retail Installment Sales Act, T.C.A. § 47-11-101, *et seq*., ("the Act") operate to exempt the dealings between these parties from Tennessee's usury statutes?

## I. *Facts*

Westside operates health and fitness centers in Hamblen County. Individuals who wish to use Westside's facilities and equipment pay membership fees for such privileges. Members often pay these fees on a monthly basis for a specified period of time pursuant to written contracts.

Jefferson is a company organized under the Tennessee Industrial Loan and Thrift Companies Act, T.C.A. § 45-5-101, *et seq*., and is engaged, generally, in the business of making and

purchasing loans.

On May 16, 1990, Westside and Jefferson entered into an agreement[2] which allowed Westside to utilize its membership contracts to generate cash.  This agreement is complex and ambiguous.  While neither of the parties seems to have completely understood its terms, the following is an accurate recitation of how the parties performed under it.  When a member signed a contract with Westside agreeing to pay membership fees in installments over time, Westside would deliver the contract to Jefferson.  If the member failed to make the first scheduled payment, Jefferson would advance no money, but instead would return the contract to Westside.  If the member made the first payment, Jefferson would calculate the "purchase price" of the contract by discounting the gross amount due under the contract by a time price differential of either 24 or 18 percent.  Jefferson would then keep for itself 10% of the "purchase price" as a "loan origination fee" and place 40% of the "purchase price" in Westside's reserve account.  Jefferson would disburse the remaining 50% to Westside.

On September 28, 1992, the parties entered into a new agreement that is substantially the same as the May 16, 1990, agreement except for the percentage to be held in reserve and the percentage to be disbursed to Westside.  Under the new agreement, Jefferson placed 30% in Westside's reserve

account and disbursed 60% to Westside. Jefferson's 10% "loan origination fee" remained the same.

Under the agreements between Westside and Jefferson, the latter collected the monies due under the health club membership contracts. Jefferson tracked each of the membership contracts individually. If a member performed his or her contract fully, Jefferson released the amount held in reserve on that particular contract to Westside. On the other hand, if a member failed to make all of the required installment payments, Jefferson notified Westside, and Westside had the option of paying the contract in full. If Westside did not pay the contract in full, Jefferson collected what was due under the contract by utilizing the funds in Westside's reserve account. If, at any time, the amount in Westside's reserve account was insufficient to fund Westside's obligations to Jefferson, Jefferson could resort to a $100,000 promissory note executed by Westside. This promissory note was secured by two deeds of trust, a continuing guaranty and a UCC-1 Financing Statement covering all of Westside's accounts receivable, contract rights and payments, personalty and equipment. This "stand-by" line of credit was never utilized, however, because the reserve account was always sufficient to cover Jefferson's obligations.

The owner and president of Westside, Ken Taylor (" Taylor"), testified that Westside entered into the agreements

with Jefferson because Westside had borrowed all it could from banks, but still required additional funds for capital improvements. Taylor also testified that Robert Schwalb ("Schwalb"), Jefferson's president, described the agreement as Jefferson loaning money to Westside and Westside's members making the payments. In contrast, Schwalb testified that he believed Jefferson owned the contracts. He further testified that Jefferson pledged them as collateral to obtain a loan of its own.

## II. *Trial Court's Judgment*

The trial court concluded that the transfer of membership contracts from Westside to Jefferson "constituted loan transactions" and were subject to applicable usury laws. In a Memorandum Opinion filed September 4, 1996, the court opined as follows:

Regarding all installment contracts assigned by [Westside] to Jefferson on and subsequent to May 16, 1990, the Court specifically finds that said assignments constituted loan transactions....The assignments of these installment contracts were so inextricably connected to the advance and disbursement of funds pursuant to the $100,000.00 line of credit that they became the very essence of the loan. Jefferson's use of the term "loan origination fee" retained for each contract assigned further substantiates a finding that said transactions constituted loans. The unrebutted testimony of owner Ken Taylor that the purpose of the $100,000.00 line of credit for the benefit of [Westside] was to obtain working capital for improvements and general operations of the business further corroborates the finding that said transactions constituted loans. Accordingly, this Court directs that all membership installment contracts assigned on and subsequent to May 16, 1990, constituted loans for which

the Tennessee usury laws apply.

Following subsequent hearings, the court concluded that Westside was entitled to a judgment in the amount of $68,519.71, plus pre-judgment interest, based on Jefferson's charging of usurious interest.

### III. *Standard of Review*

In this non-jury case, our review is *de novo* upon the record, with a presumption of correctness as to the trial court's factual determinations, unless the evidence preponderates otherwise.  Rule 13(d), T.R.A.P.; *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993); *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn. 1995).  The trial court's conclusions of law, however, are accorded no such presumption.  *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993).

### IV. *Applicable Law*

The first issue raised on appeal by Jefferson is whether T.C.A. §§ 47-11-106 and -110 of the Retail Installment Sales Act, T.C.A. § 47-11-101 *et seq.*, operate to exempt the transactions between Jefferson and Westside from the usury

laws.  This issue requires us to examine the Act according to well-established rules of statutory construction.

The primary goal of statutory construction is "to ascertain and give effect to the intention and purpose of the legislature." *Carson Creek Vacation Resorts, Inc. v. Department of Revenue*, 865 S.W.2d 1, 2 (Tenn. 1993).  Courts are to ascertain legislative intent "primarily from the natural and ordinary meaning of the language used," *id.,* "read in the context of the entire statute, without any forced or subtle construction which would extend or limit its meaning." *National Gas Distribs., Inc. v. State*, 804 S.W.2d 66, 67 (Tenn. 1991).  Additionally, a court is restricted in its analysis to the four corners of the statute unless the statute contains an ambiguity.  *Austin v. Memphis Pub. Co.*, 655 S.W.2d 146, 148 (Tenn. 1983).

T.C.A. § 47-11-106 (1995) provides that

[a]ny retail seller may assign, pledge, hypothecate, or otherwise transfer a retail installment contract or retail charge agreement to any person, firm, or corporation on such terms and conditions and for such price as may be mutually agreed upon.

T.C.A. § 47-11-110 (1995) is of particular relevance to this case.  It provides that

[a] "retail installment transaction," as defined in §
47-11-102, or any other conditional sales contract or other
agreement covering the time sale of personal property or
services, *and the assignment thereof*, and the business of
selling such personal property and services on a time payment
basis, *and the business of purchasing or acquiring such
transactions, contracts, or agreements, whether or not
regulated under this chapter, shall not be deemed to be loans
or forebearances of money or things of value or the making of
same, nor shall they be regulated by or subject to the
provisions of title 45, chapter 5, parts 1-4.*

(Emphasis added).


## V. *Analysis*


Jefferson's first argument on appeal is that T.C.A.
§§ 47-11-106 and -110 exempt the transactions between
Jefferson and Westside from Tennessee's usury laws regardless
of whether the transactions are characterized as loans or
sales.

The trial court relied, at least in part, on the
case of *Lake Hiwassee Development Co. v. Pioneer Bank*, 535
S.W.2d 323 (Tenn. 1976). *Hiwassee* involves facts similar to

those in the instant case.  In *Hiwassee*, a real estate developer transferred to a bank promissory notes that the seller had acquired in connection with its sale of subdivision lots.  *Id.* at 324-25.  The Supreme Court concluded in *Hiwassee* that the transfers constituted sales of the promissory notes.

Many of the particulars of the agreement between the seller and the transferee in *Hiwassee* are substantially similar to the terms of the agreements in the case now before us.  There is, however, a significant difference.  In *Hiwassee*, the subject matter of the underlying transactions was the sale of an interest in real property.  *Id.* at 324.  While *Hiwassee* generally applies in cases of this sort, it has no application here because, as we shall see, the subject matter of the agreement between Westside and its members is personalty and thus "goods" within the meaning of the Act.  Therefore, the Act, not *Hiwassee,* controls our resolution of the issues in this case.

Westside's first response to Jefferson's argument that the Act exempts the transactions between Westside and Jefferson from the usury laws is that this argument was not properly raised at trial and cannot be raised for the first time on appeal.  However, we find and hold that the question of whether the Act operates to exempt the transactions between the parties from the usury laws was raised and considered below.  In its Memorandum Opinion filed on September 11, 1997,

the trial court made the following statement:

Though [Jefferson] continues to assert that the entire
transaction was one of purchase rather than a loan, thereby
statutorily protected by the "Retail Installment Sales Act"
through T.C.A. 47-11-106, the Court reaffirms its earlier
findings and conclusion that the assignment of approximately
495 installment contracts constituted the crux of a
comprehensive loan rather than a purchase so as to bring the
transaction within the operation of the Tennessee usury
statutes.

This statement clearly indicates that the Act was raised and

considered by the trial court.  Thus we find that Westside's

assertion -- that the issue of the Act's applicability is not

properly before us -- is without merit.


        Westside's next argument is that the transactions

between Jefferson and Westside are not covered by the Act

because Westside is not a "retail seller" and the contracts

between Westside and its members are not "retail installment

transactions."  We disagree.  We find and hold that Westside

is a "retail seller" within the meaning of the Act.  The Act

defines a "retail seller" as one


regularly engaged in, and whose business consists to a
substantial extent of, selling goods to a retail buyer;


T.C.A. § 47-11-102(8) (1995).  "Goods" in turn are defined as


all personalty, including certificates issued by a retail
seller exchangeable for personalty or services, but not
including other choses in action, personalty sold for

commercial or industrial use, money, motor vehicles, or mobile homes.

T.C.A. § 47-11-102(2) (1995).  Black's Law Dictionary defines "personalty" or "personal property" as

everything that is the subject of ownership, not coming under denomination of real estate.  A right or interest in things personal, or right or interest less than a freehold in realty, or any right or interest which one has in things movable.

Black's Law Dictionary 1217 (6th ed. 1990).

Westside sells to its members the right to use its facilities and equipment; thus, the members acquire "personalty", i.e., a right or interest in something

> that is the subject of ownership, not coming under denomination of real estate. A right or interest in things personal, or right or interest less than a freehold in realty, or any right or interest which one has in things movable.

Black's Law Dictionary 1217 (6th ed. 1990).  This right, being personalty, comes within the broad definition of "goods" as defined in the Act.  Therefore, we find and hold that Westside is a "retail seller" under the Act because it is regularly engaged in, and its business consists to a substantial extent of, selling goods to its members.

Additionally, we find and hold that the membership contracts involved in this case are covered by the Act. The Act defines a "retail installment transaction" as

a contract to sell or furnish or the sale of or the furnishing of goods or services by a retail seller to a retail buyer pursuant to a retail installment contract or a retail charge agreement.

T.C.A. § 47-11-102(7) (1995). A "retail installment contract" is

an instrument or instruments evidencing one (1) or more retail installment transactions entered into in this state pursuant to which a buyer promises to pay in installments for goods or services....

T.C.A. § 47-11-102(6) (1995). The membership contracts at issue in this case constitute the sale of goods and services by Westside to its members pursuant to a written agreement whereby the members promise to pay in installments for the right to use Westside's facilities, equipment, and services. Thus, the membership contracts are "retail installment contract[s]" and constitute "retail installment transaction[s]."

Westside also argues that a health club membership contract cannot be a retail installment contract because the requirements for the former are set forth in T.C.A. § 47-18-305 (Supp. 1999), while the provisions applicable to "

retail installment contract[s]" are set forth in T.C.A. § 47-11-101, *et seq*. We find this argument to be without merit. There is nothing in the two statutory schemes that precludes a health club membership contract from also being characterized as a retail installment contract under the Act.[3] A health club agreement, pursuant to which a member agrees to pay his or her fees in installments, are subject to the provisions of both schemes.

Westside next argues that even if the Act applies to the membership contracts between Westside and its members, the Act does not apply to an agreement between Westside and Jefferson. More specifically, Westside argues that T.C.A. § 47-11-110 applies to a retail installment transaction and to the actual assignment of that transaction but does not apply to a separate but related loan where the retail installment transactions are transferred by the retail seller to a transferee as collateral for the separate but related loan transaction between the retail seller and the transferee. Such a construction of the statute flies in the face of the plain meaning of its language. The statute clearly contemplates the subsequent assignment of an existing contract to a third party and exempts that assignment from the operation of the usury laws. Accordingly, we find that the Act applies to the entire agreement between Westside and Jefferson, without a distinction between the transfer of the contracts and the transfer of the funds.[4]

Having decided that the Act applies, we must now determine its effect. We find and hold that it creates a broadly-defined safe harbor exempting from the usury laws the assignment of any agreement covering "the time sale of personal property or services," including retail installment sales contracts. T.C.A. § 47-11-110 (1995).

Westside's final response to Jefferson's first argument is that even if the Act applies to the transactions between Westside and Jefferson, the agreements between these parties are in violation of the Act's own "usury" provision. Specifically, Westside refers to T.C.A. § 47-11-103(d) (1995) which provides as follows:

Notwithstanding the provisions of any other law, the seller or other holder under a retail installment contract may charge, receive, and collect a time price differential which shall not exceed eleven dollars and seventy-five cents ($11.75) per one hundred dollars ($100) per year on the principal balance of each transaction.

T.C.A. § 47-11-103(f)(2) (1995) provides that

"[h]older" in this section means the retail seller unless the seller has assigned the contract, in which case "holder" means the assignee of such contract....

The "time price differential" provisions of T.C.A. § 47-11-103(d) apply to dealings between the retail seller or "

holder" on the one hand and the retail buyer on the other; but this provision does not purport to regulate a subsequent assignment of the contract by the retail seller to a transferee, except to provide that the transferee, i.e., the " holder", as well as the retail seller is limited to a certain time price differential *as against the retail buyer*.  Only T.C.A. §§ 47-11-106 and -110 expressly address the rights between the retail seller and a third party transferee.  T.C.A. § 47-11-106 provides that a retail seller may transfer a contract to a third party "for such price as may be mutually agreed upon."  T.C.A. § 47-11-110 provides that where the third party is engaged in the business of purchasing or acquiring such contracts, the acquisition, i.e., the transaction between the retail seller and the transferee, will not be deemed a loan and will not be subject to the usury laws.  Therefore, we hold that as between Westside and Jefferson, the time price differential limitation in T.C.A. § 47-11-103(d) is not relevant.

## VI.  *Other Issues*

Jefferson raises issues pertaining to the trial court 's computation of damages for Jefferson's alleged charging of usurious interest.  These issues are rendered moot by our holding that the subject transactions are exempt from the usury laws.

## VII. *Conclusion*

The judgment of the trial court is reversed.  This case is remanded for such further proceedings, if any, as may be required, consistent with this opinion and for collection of costs assessed below, all pursuant to applicable law. Costs on appeal are taxed to the appellee, Westside Health and Racquet Club, Inc.


_____
Charles D. Susano, Jr., J.


CONCUR:


_____
Houston M. Goddard, P.J.


_____
D. Michael Swiney, J.